PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

v.

DAVID DESHAWN FOSTER,

  *Defendant-Appellant.*

No. 09-5161

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:08-cr-00340-BO-1)

Argued: December 10, 2010

Decided: March 2, 2011

Before MOTZ, GREGORY, and WYNN, Circuit Judges.

Reversed, vacated, and remanded by published opinion. Judge
Gregory wrote the opinion, in which Judge Motz and Judge
Wynn joined.

## COUNSEL

**ARGUED:** Curtis Scott Holmes, BROCK, PAYNE &
MEECE, PA, Durham, North Carolina, for Appellant. Eric
David Goulian, OFFICE OF THE UNITED STATES
ATTORNEY, Raleigh, North Carolina, for Appellee. **ON**

**BRIEF:** George E. B. Holding, United States Attorney, Anne M. Hayes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

David Foster was indicted on one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Police officers discovered cocaine and drug paraphernalia on his person during the course of an investigative stop. Foster filed a motion to suppress this evidence, arguing that the officers lacked reasonable suspicion to make the stop. After ruling that the underlying circumstances provided the officers with the requisite level of suspicion, the district court denied his suppression motion. Thereafter, Foster entered into a conditional plea agreement whereby he pled guilty to the charge, but reserved his right to appeal the denial of his suppression motion.

On appeal, we hold that the officers lacked a reasonable, articulable factual basis for seizing Foster. We therefore reverse the judgment of the district court and remand.

I.

On August 8, 2008, at approximately 1:00 P.M., Detective J. Ragland, a seventeen-year veteran of the Henderson Police Department, exited a restaurant after eating lunch with his wife. As Detective Ragland, in plain clothes, walked towards his unmarked police vehicle, he noticed a young black male sitting in the driver's seat of an SUV with his hands on the steering wheel. Detective Ragland saw the man's mouth move, but could not make out what he was saying. He then

witnessed a second black male sit up in the passenger seat from a crouching position. The detective recognized the second individual as David Foster, Defendant-Appellant. Detective Ragland knew Foster because he had previously dated Foster's cousin, and he had arrested Foster in the past for driving with a revoked license. He was also aware that Foster had been arrested at one point for a marijuana-related crime. Detective Ragland believed that Foster recognized him as a police officer.

The moment the two saw one another, the detective observed Foster's arms "shifting" and "going haywire." Joint Appendix ("J.A.") 47, 69. However, Detective Ragland never saw Foster's actual hands, only his upper body and arms above the elbow. While continuing on his way towards the police vehicle, the detective walked past the SUV and asked its occupants "What are ya'll doing?" J.A. 56-57. Foster replied that they were "just chilling." J.A. 47. From his point of view, the detective could not tell whether Foster appeared nervous or otherwise apprehensive to speak. Detective Ragland then responded either "Knowing you, you are doing something else," J.A. 48, or "Knowing you, you are up to something," J.A. 60. Detective Ragland then entered his own vehicle and left the parking lot.

Detective Ragland drove across the street to a bank parking lot and continued to observe the SUV. He did not see anyone get into or approach the vehicle. He did not see anyone leave the vehicle. He called Sergeant Darnell, the drug unit supervisor, and was informed that Foster was under investigation. Detective Ragland understood this comment to mean that Foster was under investigation for a drug related offense. He also called Officer Macialek for assistance with a possible drug arrest. Approximately fifteen minutes after first encountering Foster, Detective Ragland returned to the still parked SUV with Officer Macialek.

The officers used their respective vehicles to block the SUV in, got out of their cars, and separately approached either

side of the SUV. Officer Macialek approached the passenger side of the vehicle with his gun drawn. The officers asked Foster and the driver to show their hands, and they complied. Detective Ragland asked the driver for identification, and the driver informed him that his license was in his back pocket. While the driver and Foster remained in the car, Detective Ragland performed a pat-down search. He then allowed the driver to retrieve his license. Detective Ragland asked for the vehicle registration, and Foster opened the glove compartment to retrieve it. The moment the glove compartment opened, Detective Ragland saw a plastic bag containing a white powdery substance that he believed to be cocaine, these suspicions were ultimately confirmed. Detective Ragland immediately ordered the driver and Foster to put their hands up and placed them under arrest. A later search of the SUV revealed a set of digital scales in the glove compartment, and a small travel bag tucked under the passenger's seat containing both $6,570 in cash and more cocaine. The total amount of cocaine seized was 350.5 grams.

## II.

Here, we must determine whether the stop of the defendant was supported by reasonable suspicion;[1] and, therefore, whether the district court properly denied the defendant's motion to suppress the evidence seized as a result of the stop. We review de novo the legal conclusions of the district court, but review for clear error the district court's underlying factual findings. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We also construe the evidence in the light most favorable to the Government, the prevailing party below. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998) (citations omitted).

---

[1]Both parties agree that, for Fourth Amendment purposes, the officers seized Foster.

The Fourth Amendment permits an officer to make an investigative detention or stop only if supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980). "And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Thus, a court must look to the totality of the circumstances in determining whether the officer had a particularized and objective basis for suspecting criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "While such a detention does not require probable cause, it does require something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (quoting *Terry*, 392 U.S. at 27).

Relying on the decision of the district court, the Government maintains that three factors, taken together, reasonably led Detective Ragland to initiate the stop: (1) his prior knowledge of Foster's criminal record;[2] (2) Foster's sudden appearance from a crouched position in a parked car, immediately after the driver had apparently said something to him after seeing the detective walking towards them; and (3) Foster's frenzied arm movements, including the movement of his arms down toward the floor of the car. We therefore will separately address each of these factors before evaluating them in total.

---

[2]The district court clearly erred in finding that Detective Ragland had "prior knowledge that Defendant was a drug-trafficker." J.A. 87C. Detective Ragland himself stated only that he knew Foster had been arrested for a marijuana-related offense, and was under some form of investigation. Because there was no factual basis for the court's conclusion that Foster was an actual trafficker, we will not consider this factor in our analysis. *See Ornelas*, 517 U.S. at 699 ("[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.").

Although Ragland was acquainted with Foster, and had some specific knowledge about Foster's history of automobile-related traffic offenses, he lacked any explicit familiarity with Foster's prior marijuana arrest or that arrest's ultimate disposition. "A prior criminal record 'is not, standing alone, sufficient to create reasonable suspicion.'" *Sprinkle*, 106 F.3d at 617 (quoting *United States v. Davis*, 94 F.3d 1465, 1469 (10th Cir. 1996)). Ragland was required to pair his prior knowledge of Foster's criminal record with some more "concrete factors" to demonstrate that there was a reasonable suspicion of current criminal activity. *Id.* (citing *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994)).

The Government then points to Detective Ragland's conversation with Sergeant Darnell, which seemed to confirm that Foster was under investigation for drug trafficking, to show that a reasonable officer would have had some grounds to believe that Foster was engaged in drug activity. However, a person's Fourth Amendment rights cannot be lessened simply because he or she is "under investigation" by the police. Just as an officer's knowledge of a suspect's past arrests or convictions is inadequate to furnish reasonable suspicion; so too is knowledge that a suspect is merely under investigation, which is an even more tentative, potentially innocuous step towards determining criminal activity. *Cf. Sandoval*, 29 F.3d at 542 ("[E]ven knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion.").

Next, Detective Ragland testified that his primary basis for stopping the SUV was the "suspicious behavior" of seeing "one fellow by himself appear to be talking to somebody, and all of a sudden, another man pops up and his arms going [sic] haywire." J.A. 69. Ragland stated that this was the "only reason [he] investigated that vehicle, the driver, and the passenger who happened to be . . . David Foster." *Id.* However, as discussed at length by the district court at the suppression hearing, there are an infinite number of reasonable explana-

tions, unrelated to any criminal behavior, to explain why a passenger would not immediately be visible in a car. For example, he may have simply been bending over to retrieve a dropped item from the floor of the car. We therefore are extremely wary of accepting the Government's argument that an officer may acquire a reasonable suspicion of criminal wrongdoing simply because a person suddenly becomes observable.

Finally, the Government argues that the arm shifting was suspicious because Foster knew that Ragland was a police officer and, thus, Detective Ragland could have reasonably inferred that Foster was trying to hide something. Although "[e]vasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), here, Foster did not try to evade Detective Ragland. Instead, Foster acknowledged the officer, was not noticeably nervous, and did not hastily flee the area. The men also remained parked in the SUV for at least fifteen minutes after the exchange with the detective. *Cf. United States v. Sharpe*, 470 U.S. 675, 683 n.3 (1985) (using the fact that the defendant "started speeding as soon as [police] began following" to find that police had reasonable suspicion).

Indeed, these circumstances are surprisingly similar to those in *Sprinkle*. There, we held that officers had unlawfully seized a driver, with a known criminal record, and his passenger, where the two were in a car parked in a high crime area with their hands huddled together toward the center of the car. 106 F.3d at 617-19. Here, like in *Sprinkle*, the encounter occurred in the middle of the day, and Detective Ragland did not see Foster in the possession of any drugs, money, weapons or paraphernalia. The detective never even saw Foster's hands above the elbow, and, unlike *Sprinkle*, Detective Ragland never wholly approached the car. In fact, he was never close enough to see whether Foster was nervous. *Cf. id.* at 617 (noting that the officer never saw anything in the defendant's

hands, nor saw either defendant attempt to conceal any object).

Additionally, here, unlike in *Sprinkle*, the encounter occurred in a low crime area. Detective Ragland had only a passing knowledge of a few robberies in the area. He had no knowledge of any drug related activity occurring nearby. Indeed, we find it edifying that Detective Ragland was in the area having lunch with his wife. Thus, we cannot say that this situation would have led a reasonable officer to believe that Foster was attempting to hide something.

We also note our concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity. We recognize that we must look to the totality of the circumstances when evaluating the reasonableness of a stop. *Arvizu*, 534 U.S. at 273. However, an officer and the Government must do more than simply label a behavior as "suspicious" to make it so. The Government must also be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance. *See Ornelas*, 517 U.S. at 695 (defining reasonable suspicion as a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life'" (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)); *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("[I]nvestigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Given these well-established criteria, we find it particularly disingenuous of the Government to attempt to portray these arm movements as ominous.

As in *Sprinkle*, we are convinced that—without some stronger indication of criminal activity –- the articulated facts, collectively, could not have supplied an officer with the appropriate amount of suspicion necessary for a *Terry* stop.

The detective was surprised to see Foster rise from the passenger seat, and, based on his knowledge of Foster's past criminal record, he found Foster's sudden arm movements peculiar. Nevertheless, even relying upon the "experience and specialized training" of the officer, *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010), the totality of the circumstances were not enough to validate the stop. The encounter occurred in a low crime area, there was nothing exceptional about Foster's actions in the car, and the detective's actual interaction with Foster failed to add any certainty to his instinctive concerns. Further, Detective Ragland never saw any suspicious items or contraband pass between the hands of the passengers of the vehicle. Foster did not flee, and remained in the parked vehicle for at least fifteen minutes, giving Detective Ragland time to call for the backup necessary to effectuate the stop. Whether considered alone or together these factors would have afforded the detective with little more than an "inchoate and unparticularized suspicion" that criminal behavior was afoot. *Terry*, 392 U.S. at 27.

Moreover, we are deeply troubled by the way in which the Government attempts to spin these largely mundane acts into a web of deception. Although these matters generally only come before this Court where a police seizure uncovers some wrongdoing, we would be remiss if we did not acknowledge that the exclusionary rule is our sole means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone—whether he or she is one of the most affluent or most vulnerable members of our community. *See Terry*, 392 U.S. at 12-13 ("Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions."). We appreciate that police are often called upon to make very difficult decisions about when to conduct *Terry* stops, and, for that reason, we give them leeway to make these determinations. Nonetheless, the Government cannot rely upon post hoc rationalizations to validate those seizures that

happen to turn up contraband. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 565 (1976) (noting that a purpose of the Fourth Amendment is to "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure").

In fact, although the reasonable suspicion standard is an objective test, Detective Ragland's initial comments to Foster, "Knowing you, you are up to something," clearly belie his stated reasons for initiating the stop. Accordingly, we apply the exclusionary rule here to continue to deter police from engaging in these types of unconstitutional seizures. We reverse the district court because, to do otherwise, would "invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

### III.

The stop of Foster by Detective Ragland was not supported by articulable facts sufficient to provide reasonable suspicion. We therefore find that the district court erred in denying the defendant's motion to suppress the evidence seized as a result of the stop. The district court order is reversed, Foster's conviction is vacated, and the case is remanded for further proceedings consistent with this opinion.

*REVERSED, VACATED, AND REMANDED*