**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 07-4993**

———————

UNITED STATES OF AMERICA,

　　　　　　　Plaintiff - Appellee,

　　　v.

DEONTRAYVIA ADAMS,

　　　　　　　Defendant – Appellant.

———————

**No. 11-4035**

———————

UNITED STATES OF AMERICA,

　　　　　　　Plaintiff - Appellee,

　　　v.

DEONTRAYVIA ADAMS,

　　　　　　　Defendant – Appellant.

———————

Appeals from the United States District Court for the Eastern
District of North Carolina, at New Bern.  Louise W. Flanagan,
Chief District Judge.  (5:07-cr-00006-FL; 5:07-cr-00006-FL-1)

———————

Argued:  October 26, 2011　　　　Decided:  January 25, 2012

———————

Before NIEMEYER and DIAZ, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

———————

Affirmed by unpublished opinion.  Judge Diaz wrote the opinion, in which Judge Niemeyer and Senior Judge Hamilton joined.

———————————

**ARGUED:** Paul K. Sun, Jr., ELLIS & WINTERS, LLP, Raleigh, North Carolina, for Appellant.  Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** George E. B. Holding, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Deontrayvia Adams was convicted of firearm and drug charges based on evidence seized after officers stopped him for failing to wear a seatbelt. Adams moved to suppress the evidence, contending that the traffic stop was invalid because it occurred on a private drive where the seatbelt ordinance did not apply. Adams also sought suppression of post-arrest statements he made admitting to possession of the firearm and drugs. The district court denied Adams's motion.

We conclude that the stop was justified because, regardless of whether they stopped Adams on a private drive, officers possessed reasonable suspicion to believe that a seatbelt violation had occurred or was about to occur. We also hold that Adams waived his Miranda[1] rights prior to making the inculpatory statements. Accordingly, we affirm the denial of Adams's motion to suppress.

I.

A.

Officers J.S. McCann and Shawn Thompson of the Raleigh Police Department ("RPD") were patrolling the southeast district of Raleigh, North Carolina at 4:00 a.m. when they saw Adams

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

driving a green GMC Yukon sports utility vehicle ("SUV"). The officers observed Adams stop at a stop sign and then idle there rather than proceed through the intersection. Driving in a marked police car, the officers rounded a corner and approached Adams at the intersection. As the officers neared the SUV, Adams quickly turned and drove away. McCann found this behavior suspicious and radioed Officer Christopher Clark, who was also patrolling the area, to advise him to be on the lookout for the green SUV.

Shortly thereafter, Clark saw Adams and began following him. From a distance, Clark watched as Adams made a series of turns on public streets, resulting in a u-shaped path. The circuitous route coupled with Adams's pattern of accelerating after making each turn aroused Clark's suspicion. Adams eventually turned onto Angelus Drive, a circular road lined with parking spaces that runs through an apartment complex. According to Clark, Angelus Drive is "basically a big parking lot." J.A. 106.

Clark followed the SUV onto Angelus Drive, where he observed Adams make a three-point turn. Clark watched as Adams's SUV approached his car from the front on its way back to the public road. When the SUV was within twenty to twenty-five feet of Clark's police car, he noticed that Adams was not wearing a seatbelt and turned on his blue lights to initiate a

4

traffic stop. The stop occurred near the end of Angelus Drive, where the road adjoins the public street. Although it was still dark, Angelus Drive was well lit by streetlights and the lights on the surrounding apartment buildings.

Clark approached Adams, who remained seated in the SUV, and requested his license and registration. Clark found Adams nervous during their initial conversation. After obtaining Adams's identification, Clark returned to his police car to conduct a background check. At that point, McCann and Thompson arrived, and McCann assumed the lead role in the stop. McCann approached Adams, who was still seated in the SUV, and asked him what he was doing in the neighborhood. Adams explained that he was looking for a female friend whom he recently met. During the conversation, Adams provided conflicting descriptions of where the woman lived, initially indicating she lived to the west of Angelus Drive and later stating that she lived to the southeast.

While talking with McCann, Adams leaned out the driver's window with his arms somewhat outside the vehicle. Adams was chatting nervously and loudly chewing gum, behavior that led McCann to suspect Adams was trying to divert his attention. McCann ordered Adams out of the vehicle. Adams initially resisted but eventually complied after several additional requests.

5

After Adams exited the SUV, McCann instructed him to place his hands on the vehicle to allow McCann to conduct a pat-down search for weapons. During the pat-down, McCann twice ordered Adams to keep his hands raised after Adams lowered them to his waist. McCann found a folding knife in Adams's back pocket and felt what he believed to be marijuana in his front left pocket. Adams initially ignored McCann's questions about the suspected substance but eventually confirmed that it was marijuana. McCann retrieved the contraband and discovered a single bag containing four small units of marijuana.

McCann then placed Adams under arrest and searched Adams and his vehicle. Officers found $2365 in Adams's pocket and a nine-millimeter handgun in the center console of the SUV. The officers then transported Adams to the Raleigh police station. On the way to the station, McCann notified Sergeant Craig Haines of the arrest.

At the station, Haines and McCann met with Adams in an interview room. Haines read Adams his Miranda rights using a standard RPD form. Adams acknowledged that he understood his rights but refused to sign the form. After reading Adams his rights, Haines asked McCann to leave the interview room. Haines was concerned that the presence of the uniformed arresting officer was preventing Haines from building rapport with Adams.

6

Haines did not videotape or record the interview but did take contemporaneous handwritten notes. According to Haines, there was an RPD policy at the time that prohibited audiovisual recordings of interviews in noncapital cases. Haines attempted to question Adams about the marijuana and firearm, but Adams repeatedly interrupted Haines with his own questions about the legality of the stop and the charges he faced. After approximately five minutes of unproductive conversation, Haines left the interview room to assist the other officers with paperwork.

Less than five minutes after Haines's departure, Adams called out for Haines to return. After Haines reentered the interview room, Adams said he was not trying to be difficult and was willing to talk. During the second interrogation, Adams confirmed that he regularly smoked marijuana and possessed the firearm for protection from a man who shot at him following a dispute over a female.

B.

A federal grand jury charged Adams in a two-count indictment with possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and 924, and possession of a quantity of marijuana in violation of 21 U.S.C. § 844(a). Eleven days after the deadline for pretrial

7

motions expired, Adams filed a motion to suppress. The district court denied Adams leave to file an untimely motion and ordered the motion to suppress stricken. Adams was convicted by a jury on both counts and subsequently sentenced by the district court. Adams appealed. Among the issues Adams raised in his first appeal was the district court's decision to strike his motion to suppress as untimely. This court vacated that ruling and remanded for the district court to consider Adams's motion. On remand, a federal magistrate judge held an evidentiary hearing.

At the hearing, Adams argued that the stop was invalid because he was not required to wear a seatbelt on a private road like Angelus Drive. Adams also contended there was no basis for the stop because the officers could not have seen whether he was wearing a seatbelt. Finally, Adams maintained that he did not voluntarily waive his Miranda rights during his custodial interrogation. Adams offered evidence from a private investigator, describing the characteristics of Angelus Drive. The evidence included photographs and videos depicting Angelus Drive and the surrounding area at various times, including at approximately 4:30 a.m. Based in part on the fact that it was not maintained by the city, the investigator classified Angelus Drive as a private circular road designed to serve residents of the surrounding apartment complex.

8

The magistrate judge issued a memorandum and recommendation to deny Adams's motion to suppress. The magistrate judge reasoned that, regardless of whether Angelus Drive is a public or private road, officers had a reasonable suspicion that Adams had committed or was about to commit a seatbelt violation by driving on the adjoining public roads. The magistrate judge found Clark's testimony regarding his observation of the seatbelt violation credible and gave little weight to the evidence presented by Adams's private investigator. Finally, the magistrate judge credited Haines's testimony that he advised Adams of his Miranda rights, finding that Adams waived those rights by responding to questions after receiving Miranda warnings. Adams objected to the magistrate judge's factual findings and conclusions of law.

The district court overruled Adams's objections and adopted the findings of fact outlined in the magistrate judge's memorandum and recommendation. Upon de novo review of the record, the district court agreed with the magistrate judge's conclusion regarding Clark's credibility and the limited value of the private investigator's testimony. The district court concluded that Clark was in fact able to see that Adams was not wearing his seatbelt. With respect to the interrogation, the district court agreed that Haines testified credibly and concluded that Adams's waiver of his Miranda rights was knowing

9

and voluntary. The district court adopted the magistrate judge's recommendation and denied the motion to suppress.

Adams appealed, challenging the district court's holding both with respect to the validity of the traffic stop and the voluntariness of his custodial statements. We consider each claim in turn, reviewing the district court's factual findings for clear error and its legal conclusions de novo. United States v. Blauvelt, 638 F.3d 281, 287 (4th Cir. 2011).


II.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. When a police officer stops an automobile and briefly detains the occupants, the stop constitutes a seizure within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809–10 (1996). The primary directive of the Fourth Amendment is that all such seizures must be reasonable. Wilson v. Arkansas, 514 U.S. 927, 931 (1995).

We analyze a traffic stop under the standard established in Terry v. Ohio, 392 U.S. 1 (1968), applying a two-part test to evaluate the constitutionality of the stop. United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). Under this "dual inquiry," we first consider whether the officer's initial action in executing the stop was justified. United States v. Rusher,

10

966 F.2d 868, 875 (4th Cir. 1992).  Next, we analyze whether the officers' subsequent actions were "reasonably related in scope to the circumstances that justified the stop."  Digiovanni, 650 F.3d at 506 (citing Rusher, 966 F.2d at 875).

An investigatory stop is justified based on an officer's "reasonable suspicion of illegal activity" and does not require a finding of probable cause.  United States v. Harris, 39 F.3d 1262, 1269 (4th Cir. 1994).  We evaluate the justification for an investigatory stop on an objective basis.  Illinois v. Wardlow, 528 U.S. 119, 123 (2000).  Thus, "if sufficient objective evidence exists to demonstrate reasonable suspicion, a Terry stop is justified regardless of a police officer's subjective intent."  United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008).

On appeal, Adams focuses his argument on the first part of the Terry dual inquiry, contending that the officers lacked an initial justification for the traffic stop.  Adams offers two alternative arguments in support of this contention.  First, he argues that the law and the facts do not support the district court's conclusion that he had violated or was about to violate the seatbelt ordinance.  Second, Adams challenges the district court's factual finding that Clark was able to see that Adams was not wearing a seatbelt at the time of the stop.  We find

11

Adams's arguments unpersuasive and conclude that the stop was lawful.

A.

Adams argues that the officers lacked justification for the traffic stop because any failure to wear a seatbelt on Angelus Drive did not violate the North Carolina seatbelt ordinance. According to Adams, the ordinance did not apply at the time of the stop because Angelus Drive is a private road. The district court sidestepped this issue, holding instead that Clark had a reasonable belief Adams had recently committed a seatbelt offense while driving on the indisputably public roads adjoining Angelus Drive or was about to commit such an offense by returning to those roads. We agree.

Under the Fourth Amendment, a police officer may conduct a brief investigatory stop if he has "a reasonable suspicion grounded in specific and articulable facts that the person he stopped has been or is about to be involved in a crime." United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) (citing United States v. Hensley, 469 U.S. 221, 227 (1985); Terry, 392 U.S. at 21). Observation of a traffic violation justifies stopping a vehicle to issue a citation. Branch, 537 F.3d at 337. The North Carolina seatbelt ordinance requires occupants of a motor vehicle to wear a seatbelt "at all times when the

12

vehicle is in forward motion on a street or highway." N.C. Gen. Stat. § 20-135.2A(a). The distinguishing feature of a street or highway under North Carolina law is that it must be "open to the use of the public as a matter of right for the purposes of vehicular traffic." Id. § 20-4.01(13).

Here, the officers observed Adams driving on several public roads immediately prior to his turn onto Angelus Drive. Once on Angelus Drive, Adams did not attempt to park or exit his vehicle but instead turned around and proceeded back toward the adjoining public roads. At the time of the stop, Adams was near the end of Angelus Drive at a point where he would have to turn back on to one of the public roads. Accordingly, upon seeing Adams on Angelus Drive without a fastened seatbelt, an officer in Clark's position could reasonably conclude that Adams either had just committed a traffic violation moments earlier by driving on the adjoining roads without a seatbelt or was about to commit such an offense by returning to those public roads. Based on this rational inference, the officers had reasonable suspicion to conduct the stop. See United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998) (explaining that we construe the evidence in the light most favorable to the government, the prevailing party below).

Adams contends, however, that Clark did not rely on a prior or future violation of the seatbelt ordinance as justification

13

for the stop.  Instead, in Adams's view, Clark initiated the stop based on a perceived violation on Angelus Drive.[2]  According to Adams, the conclusion that he violated the seatbelt ordinance based on his earlier travel on the public roads around Angelus Drive or that he was about to commit such a violation by returning to those roads represents an unlawful post hoc justification.  In support, Adams relies on our recent decision in United States v. Foster, 634 F.3d 243 (4th Cir. 2011), in which we stated that "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband."  Id. at 249.  Adams's argument fails to recognize, however, the objective nature of the reasonable suspicion inquiry and misreads our decision in Foster.

---

[2] The parties dispute whether a mistaken conclusion by Clark that Angelus Drive was a public "street or highway" for purposes of the seatbelt ordinance would constitute a mistake of law or a mistake of fact.  Courts generally hold that reasonable mistakes of fact do not warrant suppression, whereas mistakes of law often do result in suppression.  Compare United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment.") with United States v. Raney, 633 F.3d 385, 393–94 (5th Cir. 2011) (vacating denial of a motion to suppress and finding that "[b]ecause the government did not establish that [the defendant] committed a traffic violation on any of the argued grounds, we find that as a matter of law there was no objective basis justifying the traffic stop").  Because our analysis of the merits of the traffic stop in this case does not turn on the characteristics of Angelus Drive, we need not resolve this dispute.

14

Supreme Court precedent "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." Whren, 517 U.S. at 812–13. Applying this principle, we have explained that an "otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some [other] criminal activity." United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993) (quoting United States v. Cummins, 920 F.2d 498, 500–01 (8th Cir. 1990)). In Foster, this court adhered to prior Supreme Court precedent by properly applying this objective basis test. 634 F.3d at 246 ("[A] court must look to the totality of the circumstances in determining whether the officer had a particularized and objective basis for suspecting criminal activity." (citing United States v. Arvizu, 534 U.S. 266, 273 (2002))). Our concern in Foster was not with the objective nature of the inquiry but instead, related to the government's attempt to string together "whatever facts are present, no matter how innocent, as indicia of suspicious activity." Id. at 248. In contrast, the objective facts in this case are more than sufficient to support the officer's decision to initiate a traffic stop.

After following Adams's SUV on several public roads, Clark observed Adams on Angelus Drive without a fastened seatbelt on

15

his way back toward the public roads.  Putting any subjective intentions aside—as we must under the objective test articulated by the Supreme Court—this observation supports the rational inference that Adams had recently committed or was about to commit a traffic violation.  Accordingly, Clark had an objective justification for stopping Adams.

B.

We next consider Adams's challenge to Clark's testimony that he observed Adams not wearing a seatbelt.  According to Adams, Clark could not have seen whether Adams was wearing a seatbelt "in the dark with the Yukon's lights glaring in his eyes, fatigued from having been on patrol since 9 p.m. the prior evening, with the additional distortion produced by an unwashed windshield and movement of his vehicle."  Appellant's Br. 33. The district court disagreed and concluded that Clark had in fact observed Adams driving without a seatbelt.  We discern no clear error in the court's finding.

In evaluating Clark's demeanor and credibility, the magistrate judge found that Clark "answered the questions put to him forthrightly and without evasion." J.A. 465.  The district court rejected Adams's objection to the magistrate judge's credibility determination, concluding under de novo review that his conclusion was supported by the record.  In addition to the

16

credibility finding, the magistrate judge and district court concluded that the characteristics of the site of the traffic stop supported Clark's testimony. In findings adopted by the district court, the magistrate judge concluded that the area was well lit by streetlights and lighting from the surrounding apartment buildings. The district court rejected as speculative Adams's arguments related to the angle of the headlights, officer fatigue, and the unwashed windshield. Finally, the court gave little weight to the testimony and evidence presented by Adams's witness—finding that the private investigator lacked training with video and photographic equipment and that the evidence depicted the scene as "substantially darker than in real life." Id. 467.

We afford particular deference to the trial court's credibility determinations, "for 'it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress.'" United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008) (quoting United States v. Murray, 65 F.3d 1161, 1169 (4th Cir. 1995)). Here, the magistrate judge carefully analyzed the witnesses' credibility and the evidence presented, and thoroughly explained his factual findings. The district court in turn conducted a de novo review of the record and adopted the magistrate judge's factual findings. Under our deferential clear error standard, we affirm the district court's

17

conclusion that Clark saw Adams driving without a fastened seatbelt on Angelus Drive.

Having found that the officers had an objective basis for the stop and that the district court did not clearly err in crediting Clark's testimony, we affirm the district court's denial of the motion to suppress the evidence seized from the traffic stop.

III.

Finally, we consider Adams's claim that his statements admitting possession of the drugs and firearm should be suppressed. Adams contends both that the district court clearly erred in crediting Haines's testimony related to Adams's interrogation and statements, and that it incorrectly held that Adams waived his Miranda rights.

In Miranda, the Supreme Court required that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." Missouri v. Seibert, 542 U.S. 600, 608 (2004).

18

In order for a waiver of Miranda rights to be valid, it must be made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 444. Waiver, however, need not be express but may be inferred from the actions and words of the person interrogated. North Carolina v. Butler, 441 U.S. 369, 373 (1979). Thus the issue of waiver under Miranda is "not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case." Id.

A defendant's willingness to answer questions after acknowledging he understands his Miranda rights constitutes an implied waiver of those rights. United States v. Cardwell, 433 F.3d 378, 389-90 (4th Cir. 2005). Additionally, "[t]he mere passage of time . . . does not compromise a Miranda warning." United States v. Frankson, 83 F.3d 79, 83 (4th Cir. 1996). In Frankson, we held that the defendant's "initial Miranda warning was in no way compromised by the passage of two and one-half hours between the issuance of his warning and the point at which he began to confess his crimes and cooperate with the police." Id.

In support of his contention that the district court erred in its factual findings, Adams highlights that Haines cleared the room prior to the interrogation and did not record the conversation. The evidence shows, however, that Haines had

19

legitimate reasons for these actions. McCann was in uniform and had just arrested Adams. Haines testified that he wanted to build rapport with Adams and had never conducted an interview alongside McCann. Thus it was reasonable for Haines to ask McCann to leave. With respect to the failure to record the conversation, Haines testified that there was an RPD policy not to record interviews in noncapital cases.

These facts coupled with the magistrate judge's finding—adopted by the district court—that Haines's "demeanor at the hearing conveyed trustworthiness," J.A. 474, support the district court's conclusion that Haines advised Adams of his Miranda rights and that Adams reinitiated the interview on his own free will prior to his admissions. Accordingly, we find no clear error in the version of events found by the district court.

Adams contends that even if we believe Haines's testimony, the undisputed evidence shows that Adams did not voluntarily, knowingly, and intelligently waive his Miranda rights. In support, Adams explains that he did not sign the Miranda waiver, initially refused to discuss the drugs and firearm, and did not receive additional warnings prior to his second conversation with Haines. We are not persuaded.

As Adams acknowledges, failure to sign a waiver form does not invalidate a subsequent waiver of Miranda rights. United

20

States v. Thompson, 417 F.2d 196, 197 (4th Cir. 1969) (per curiam) (holding that defendant's "refusal to sign a written waiver did not render the confession inadmissible" (citing United States v. Hayes, 385 F.2d 375 (4th Cir. 1967)). Haines and McCann both testified that Adams acknowledged that he understood his rights despite his refusal to sign the waiver form. And the evidence shows that although Adams was initially uncooperative, he subsequently reinitiated the interview on his own accord and admitted to possession of the drugs and firearm. Haines testified that at most five minutes elapsed between his departure from the interview room and Adams's request for him to return. Courts have found that much longer periods of time between the administration of Miranda warnings and a defendant's admissions have not affected the validity of a Miranda waiver. Frankson, 83 F.3d at 83 (cataloging cases in which several hours did not invalidate the waiver).

Accordingly, we find that Adams voluntarily, knowingly, and intelligently waived his Miranda rights when he responded to Haines's questions after earlier acknowledging that he understood his rights.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>