DIAZ, Circuit Judge,
dissenting:
While on routine patrol, Newport News Police Officer R.B. Tinsley observed Irvin Bumpers for five to ten seconds standing next to another man by the side of an open convenience store near a dumpster. The store was located in a high-crime area. The store owner had posted “no trespassing” signs and had also asked the police to enforce a no trespassing policy. When Officer Tinsley approached, Bumpers quickly walked away before being stopped.
These facts are as undisputed as they are insufficient to establish a reasonable, particularized suspicion that criminal activ *178 ity was afoot. See Terry v. Ohio, 392 U.S. 1, 27, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Permitting a Terry stop under these tenuous circumstances fails to prevent a substantial portion of innocent travelers in high-crime areas from being subjected to what the majority concedes can be a degrading and unwarranted intrusion. Maj. Op. at 176. Because I cannot square such a result with the dictates of the Fourth Amendment, I respectfully dissent.
I.
A.
The district court summarized the underlying facts, which are undisputed, as follows:
On December 18, 2009, at approximately 7:30 p.m., Officer Tinsley was on patrol in the area of a convenience store located at 2610 Chestnut Avenue in Newport News, Virginia. While on patrol, Officer Tinsley observed the defendant standing with another man on the side of the convenience store nearby a trash dumpster.[1] As Officer Tinsley entered the parking lot, the defendant and his companion noticed Officer Tinsley’s squad car and began to quickly walk away from the area. Officer Tinsley then exited his vehicle, told the defendant he was not free to leave due to possible trespassing, and asked to see the defendant’s identification.[2] The defendant stated that he did not have any identification and told Officer Tinsley that his name was Aaron Bumpers. Officer Tinsley then ran a check on the name “Aaron Bumpers,” which revealed an outstanding warrant. When Officer Tinsley informed the defendant of the warrant, the defendant notified Officer Tinsley of his true name. Officer Tins-ley ran a check on the defendant’s true name, discovered an active warrant, and arrested the defendant. During a search incident to arrest, Officer Tinsley found a loaded .38 caliber revolver in the defendant’s pocket. Officer Tinsley advised the defendant of his Miranda rights!,] and the defendant confirmed that he understood those rights. The defendant then told Officer Tinsley that he and his friend were “rolling dice” and “smoking weed” next to the dumpster.
J.A. 68-69.
Bumpers moved to suppress evidence of the firearm. The district court held that Officer Tinsley had reasonable suspicion to stop Bumpers based on (1) Bumpers’s presence in a high-crime area; (2) the store’s “no trespassing” sign; and (3) Bumpers’s reaction to Officer Tinsley’s approach.
B.
In considering the district court’s ruling on a motion to suppress, we review the court’s factual findings for clear error. United States v. Foster, 634 F.3d 243, 246 (4th Cir.2011). In addition, we “give due weight to inferences drawn from those *179 facts by resident judges and local law enforcement officers.” United States v. Humphries, 372 F.3d 653, 657 (4th Cir.2004) (internal quotation marks and citation omitted). However, “the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed de novo.” Ornelas v. United States, 517 U.S. 690, 691, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (emphasis omitted).
Whenever a police officer restrains an individual’s freedom to walk away, he has “seized” that person for Fourth Amendment purposes. Terry, 392 U.S. at 16, 88 S.Ct. 1868. Brief, investigatory stops are justified “where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.” Id. at 30, 88 S.Ct. 1868. But an “inchoate and unparticularized suspicion or ‘hunch’ ” is not a permissible basis for a Terry stop. Id. at 27, 88 S.Ct. 1868. Moreover, “[tjhough the facts need not give rise to probable cause, the officer must be able to articulate an objectively reasonable suspicion of criminal activity” sufficient to justify the stop. United States v. Hernandez-Mendez, 626 F.3d 203, 207 (4th Cir.2010) (citing United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).
We examine “the totality of the circumstances in order to determine whether officers had a ‘particularized and objective basis for suspecting the person stopped of criminal activity.’ ” Id. at 207-08 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). “The reasonable suspicion inquiry is fact-intensive, but individual facts and observations cannot be evaluated in isolation from each other.” Id. at 208. An officer’s articulated facts must in their totality serve to exclude a substantial portion of innocent travelers before reasonable suspicion will exist; otherwise, innocent individuals will be subject to “virtually random seizures.” Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); see also United States v. Digiovanni, 650 F.3d 498, 511 (4th Cir.2011).
C.
Here, the circumstances found by the district court are insufficient to support Officer Tinsley’s decision to stop Bumpers. The government and the majority rely heavily on the district court’s finding that Bumpers was in a high-crime area. Both, however, give this factor more weight than it can bear. “An individual’s presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.... ” Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). And while a court may consider this factor as one of many in the totality-of-the-circumstances inquiry, id., the majority appears to give it dispositive weight, noting that the result might be different “[i]f the precise place had a less violent history.” Maj. Op. at 176.
The Supreme Court has found reasonable suspicion where an individual’s presence in a high-crime area is coupled with headlong flight, noting that such flight is the “consummate act of evasion.” See Wardlow, 528 U.S. at 124, 120 S.Ct. 673. But affirming the district court here, where Bumpers simply walked away from the officer, sets an even lower bar for permitting stops in high-crime areas. We should be especially cautious in sanctioning this result because it poses constitutional concerns beyond the Fourth Amendment.
I have great respect for police officers, the vast majority of whom perform incredibly tough jobs with great honor and pro *180 fessionalism. But placing the judicial imprimatur on the stop conducted here, when a stop under similar circumstances would likely be impermissible elsewhere, may encourage some officers to make race-based stops under the pretense of policing high-crime areas.* Cf. United States v. Avery, 137 F.3d 343, 355 (6th Cir.1997)(“If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen’s race, without more, then a violation of the Equal Protection Clause has occurred.”). Simply put, while the location of the stop is a relevant consideration, it does not excuse police officers from articulating a reasonable suspicion specific to the particular individual stopped. See Hernandez-Mendez, 626 F.3d at 207-08.
The government relies on two Virginia state cases that it claims lend substantial weight to a defendant’s location when stopped on suspicion of trespassing. In particular, the government directs our attention to Joyce v. Commonwealth, 56 Va. App. 646, 696 S.E.2d 237 (2010), where the court held that an officer had probable cause to perform a search incident to arrest when the officer observed a defendant standing at the side of a convenience store, the store had posted a “no trespassing” sign, and the officer witnessed a hand-to-hand exchange between the defendant and another man. Joyce, however, is readily distinguishable because the officer in that case (1) first spoke with the defendant to obtain additional information before seizing him; and (2) observed a hand-to-hand exchange between the defendant and another man, indicating both that the defendant was not lawfully on the property and that he might be engaged in a drug transaction. Id. at 242.
The government also relies on Raab v. Commonwealth, 50 Va.App. 577, 652 S.E.2d 144 (2007), where the court held that an officer had reasonable suspicion to perform a Terry stop after observing that the defendant was parked in a restaurant parking lot at 12:40 a.m. that had “for patrons only” signs posted and attempted to drive off upon seeing the police. Id. at 146. In that case, however, the restaurant was closed, thus leading to the reasonable inference that the defendant was not likely a patron. In contrast, Bumpers was standing in the parking lot of a convenience store during normal operating hours.
A more apt Virginia state case is Harris v. Commonwealth, 262 Va. 407, 551 S.E.2d 606, 607 (2001), where a police officer received an anonymous tip that an armed African-American man was selling drugs in an area posted “no trespassing.” The Supreme Court of Virginia held that a Terry stop of the defendant was unconstitutional because “the mere presence of an unknown individual on the property of a large housing development does not create a reasonable suspicion that such an individual is engaged in trespassing or some other criminal activity.” Id. at 611. Likewise, Officer Tinsley merely observed Bumpers for a few seconds standing adjacent to an open convenience store, and he did nothing to determine whether Bumpers was lawfully on property open to the public before stopping him.
Both the government and the majority also rely on the district court’s finding as to the direction and manner in which Bumpers walked away from Officer Tins-ley. In particular, both contend that Bumpers’s reaction was not that of a store *181 patron, thereby supporting a reasonable suspicion of trespassing. See J.A. 17; Maj. Op. at 175-76.
Admittedly, when a person displays “evasive behavior,” his conduct is relevant to the reasonable suspicion analysis. Wardlow, 528 U.S. at 124, 120 S.Ct. 673. But it is also true that “when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.” Id. at 125, 120 S.Ct. 673. That is precisely what happened here, as Officer Tinsley simply did not have a sufficient basis for reasonably suspecting Bumpers of any offense in the five to ten seconds that he saw Bumpers standing in the parking lot.
Another Virginia state ease is instructive on this point. In Ewell v. Commonwealth, 254 Va. 214, 491 S.E.2d 721 (1997), the Supreme Court of Virginia held that a police officer did not have a reasonable suspicion to stop a defendant for trespassing under the following circumstances: at 12:30 a.m. the officer observed an unfamiliar automobile in the parking lot of an apartment complex that was known for drug trafficking, and the automobile (driven by Ewell) exited the parking lot when the police officer arrived. According to the court, “nothing about Ewell’s conduct was suspicious. Indeed, Ewell acted as any other person might have acted under similar circumstances.” Id. at 723. But for the fact that Bumpers was on foot, I see no material difference between the record before us and the circumstances found woefully lacking in Ewell on the question of reasonable suspicion.
In fact, the circumstances here are at least as unpersuasive as those we have previously held insufficient to create a reasonable suspicion. For example, in Foster, we held that a Terry stop was not justified where the officer observed the defendant—whom the officer knew had a prior criminal record—suddenly jump from a crouched position and move his arms in a “frenzied” manner towards the floor of the vehicle upon seeing the officer. 634 F.3d at 246-47. Likewise, in United States v. Sprinkle, 106 F.3d 613 (4th Cir.1997), we held that there was no reasonable suspicion where the officer spotted the defendant in a high-crime area huddled next to a convicted drug dealer with their hands together, the defendant attempted to hide his face from the officer as he walked past the vehicle, and the defendant acted evasively by driving off as soon as the officers passed. Finally, in United States v. Massenbnrg, 654 F.3d 480 (4th Cir.2011), we concluded that reasonable suspicion was absent where an individual was observed several blocks from where gunfire had been heard and nervously declined a consensual request for a pat down. While the result in each of these cases is admittedly fact-specific, together they illustrate that reasonable suspicion requires more than this record contains.
The majority attempts to distinguish Foster and Massenburg on the ground that the defendants in those cases acknowledged and spoke to the police officers. This, however, is an immaterial distinction because a person is not obligated to speak to law enforcement. See Maj. Op. at 171 (acknowledging that an individual has a right “to refuse to ‘answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.’ ” (quoting Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion))).
Nor is this case different because, as the majority contends, Bumpers’s departure terminated the suspected trespassing offense. Except to the extent that Bumpers’s attempt to leave the store parking lot might be characterized as minimally eva *182 sive, I fail to see how that fact is at all relevant; either Officer Tinsley had reasonable suspicion to stop Bumpers for trespassing, or he did not. If anything, Foster and Massenburg present more compelling cases for a valid Terry stop because the suspected crimes were more serious and posed potential threats to public safety, factors absent when someone is suspected of trespassing in the parking lot of an open convenience store. Cf. United States v. Price, 599 F.2d 494, 500 (2d Cir.1979) (“The need for a stop depends upon factors such as the seriousness of the offense suspected [and] the consequences of delay on the part of the officers.... ”). In this context, the crime being investigated matters. Thus, if Tinsley had witnessed a hand-to-hand exchange indicative of a drug transaction, or if he had observed a suspicious bulge indicative of a concealed weapon, the stop would likely have been justified regardless of the length of observation.
Officer Tinsley, however, saw Bumpers standing in the parking lot of an open convenience store for a matter of seconds before walking away quickly as the officer approached. Although there is no bright-line rule for how long an officer must observe an individual’s conduct before initiating a stop, if called to account, the officer must be able to articulate facts sufficient to separate a large number of innocent travelers from intrusion. Reid, 448 U.S. at 441, 100 S.Ct. 2752; Digiovanni, 650 F.3d at 511. With all due respect to my colleagues, that dividing line is nowhere to be found in the majority’s holding.
There are any number of reasons why someone might be standing in a parking lot adjacent to an open convenience store. As Bumpers notes, “[i]t would hardly be remarkable for a patron to linger [a few seconds] after making a purchase, or to contemplate whether to go in the store at all, or for a pedestrian to chat with a friend whom he saw on the street, or to ask someone for directions, or simply to catch his breath while walking home.” Appellant’s Br. at 16. Reviewing the district court’s legal conclusions de novo, I would hold that Officer Tinsley had noth-, ing more than a mere “inchoate and unpar-ticularized suspicion or ‘hunch’ ” of criminal activity. Terry, 392 U.S. at 27, 88 S.Ct. 1868. Because the Fourth Amendment and our cases require more, I would reverse the district court’s judgment.
II.
Two pervasive errors lead my colleagues to hold otherwise: (1) they fail to apply the applicable de novo standard of review; and (2) they improperly weigh a policy consideration that has no place in our analysis of whether the stop was proper.
A.
De novo review applies to the ultimate question of whether reasonable suspicion supported Bumpers’s seizure. Ornelas, 517 U.S. at 691, 116 S.Ct. 1657. But the majority here is content to “uphold[] a district court’s Terry ruling when it is objectively reasonable in light of the record,” suggesting that variations in such rulings are not “necessarily unreasonable so long as the Fourth Amendment balance is assiduously and conscientiously maintained.” Maj. Op. at 174.
The majority’s analysis, however, bears a striking resemblance to the standard rejected in Ornelas. There, the Supreme Court declined to adopt a “policy of sweeping deference” to district court rulings that “would permit, [i]n the absence of any significant difference in the facts, the Fourth Amendment’s incidence [to] tu[rn] on whether different trial judges draw general conclusions that the facts are suffi *183 cient or insufficient to constitute probable cause.” 517 U.S. at 697, 116 S.Ct. 1657 (internal quotations omitted, alterations in original). According to the Court, such a result “would be inconsistent with the idea of a unitary system of law” and “unacceptable.” Id.
Yet the majority clings to dicta from Ornelas concerning appellate review of factual findings and inferences drawn from those findings to justify its decision to defer to the district court’s ultimate legal conclusion, despite the absence of any factual disputes in this record. This, in my view, improperly gives district courts carte blanche to determine whether a Fourth Amendment violation has occurred and abdicates our duty to independently review such legal determinations. Id.
The majority also suggests that by failing to defer generally to district court rulings on Terry stops, this court would allow “less room for the flexibility of fact-finding in future cases and hence a heightened risk that either personal liberty or public safety will be unreasonably shortchanged.” Maj. Op. at 10. I see little merit to this concern because the facts of Terry stop cases are generally sui generis, and we properly accord substantial deference to a district court’s factual findings. As a result, the cases do not lend themselves easily to broad holdings, and so are not likely to inflexibly hamper the district courts. Far more troubling is the threat to individual liberties when we fail to exercise our own judgment in deciding whether law enforcement has unlawfully subjected a person to an unconstitutional intrusion.
B.
In addition to failing to apply the correct standard of review, the majority stretches the totality-of-the-circumstances test beyond its proper limit. When assessing a Fourth Amendment violation, courts generally review “the circumstances known to the officer and ‘the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.’ ” United States v. Smith, 396 F.3d 579, 583 (4th Cir.2005) (quoting Terry, 392 U.S. at 27, 88 S.Ct. 1868). But to lend further support to the stop in this case, the majority also opines on the role of public safety in fostering the economic viability of convenience stores in urban areas, without citation to any authority except a policy paper from the Federal Reserve Bank of St. Louis. See Maj. Op. at 171-73.
To my knowledge, no court has heretofore applied a version of Fourth Amendment “lite” based on the socioeconomic needs of the community where a stop occurs. To the contrary, all persons should expect that courts will honor their right to be free from unreasonable seizures “whether he or she is one of the most affluent or most vulnerable members of our community.” Foster, 634 F.3d at 249. Any lesser standard “has the necessary effect of legitimizing the [unlawful] conduct which produced the evidence,” Terry, 392 U.S. at 13, 88 S.Ct. 1868, a result we should not condone.
III.
In my view, the district court erred in concluding that Officer Tinsley had a reasonable suspicion to stop Bumpers for trespassing. Accordingly, I respectfully dissent.

. Officer Tinsley testified that he observed the defendant standing in this location for five to ten seconds, and did not see the defendant or the other man enter or leave the convenience store, which was open for business at the time these events took place. Officer Tinsley also testified that the convenience store is located in a high crime area. Specifically, Officer Tinsley noted that the convenience store is located in one of the worst "drug neighborhoods" in Newport News. Officer Tinsley also noted that shootings frequently occur in this area.

. At the time these events took place, the convenience store parking lot was posted "No Trespassing,” and a letter requesting the police to enforce a no trespassing policy was on file with the Newport News Police Department.

 I do not suggest that Officer Tinsley acted with such a motive in this case, but merely observe that potential collateral consequences caution against concluding that reasonable suspicion may be based on neighborhood characteristics and little else.