**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

PAUL RAMON GLOVER,

*Defendant-Appellant.*

No. 10-4462

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:09-cr-00083-RJC-1)

Argued: October 28, 2011

Decided: December 9, 2011

Before WILKINSON, KING, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Diaz joined.

## COUNSEL

**ARGUED:** Matthew Segal, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Richard Lee Edwards, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Execu-

tive Director, Peter S. Adolf, Assistant Federal Defender, FEDERAL DEFENDERS OF WESTERN NORTH CARO-LINA, INC., Charlotte, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

Paul Glover entered a conditional plea of guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He now appeals the denial of his motion to suppress evidence obtained during a stop-and-frisk in a deserted gas station parking lot in the wee hours of the morning. For the reasons that follow, we affirm the district court's denial of Glover's suppression motion.

I.

In the early morning hours of March 24, 2009, Officers Aaron Skipper and Travis Archer of the Charlotte-Mecklenburg Police Department were patrolling the Eastway Division of Charlotte, North Carolina in a marked police car. Each officer had been with the police department for six years and was familiar with the area. Officer Skipper had patrolled the Eastway Division since early 2004 and Officer Archer had been assigned to the area for his entire six years on the force. Based on their past experience as well as their nightly briefings on criminal activity, both officers knew that the Eastway Division was plagued by armed robberies and assaults.

Around 4:40 a.m., the officers pulled into a twenty-four hour gas station located at the intersection of Westover Street and Central Avenue. Both officers were familiar with this facility. Approximately one year earlier, Officer Skipper had

investigated a robbery of this particular gas station and Officer Archer knew that it had been previously robbed as well. Officer Skipper was also aware that in the early hours of the morning, this gas station remained open for business even though its doors were locked. Usually a single attendant would be on duty during these hours and he would either let one customer into the building at a time or deal with customers through a slot in the glass similar to a bank teller's window.

On this occasion, however, the officers noticed that the attendant was outside the protection of the locked building. As Officer Skipper observed, he was instead bent down in the parking lot and "preoccupied" with using a large dipstick to check the levels of the fuel tanks. There were no vehicles in the parking lot at this time.

Aside from the attendant, the only person in the area was Glover, who was standing at the back corner of the station and appeared to be talking on a cell phone while watching the attendant. Glover's location caught the attention of Officer Skipper, who knew from investigating a previous robbery that this area was not covered by the gas station's surveillance cameras. Officer Archer also noticed Glover "glancing around the corner" and then pulling "his head back as if he were trying to hide." According to the officers, Glover and the attendant were about forty-five to sixty feet apart at the time.

The officers pulled into the back parking lot from a side entrance and then drove around to the front as if they were exiting onto Central Avenue. As they drove through the lot, Glover "followed [their] movements with his eyes and head." The officers agreed that Glover's observation of the attendant was suspicious and they were concerned about the possibility of "[t]he store being robbed." Officer Skipper suggested that they "should get out and speak with" Glover to "find out what he was doing."

So instead of leaving, the officers circled back around and drove again into the station's back parking lot. In the approximately five to six seconds they were out of Glover's sight, he had traversed the forty-five to sixty feet that had previously separated him from the attendant and was, as Officer Archer observed, "standing, basically, over top of him." The attendant was "still bent down checking the fuel levels" and appeared to be unaware that Glover was standing only a foot or two away from him.

The officers parked the patrol car and walked over to Glover and the attendant, who were neither engaged in a conversation nor making eye contact with one another. Concerned that Glover was "stalking the clerk" and "believ[ing] him to have a weapon," Officer Skipper informed Glover that he was going to pat him down and then proceeded to do so. When he patted Glover's right pants pocket, he felt an object he believed was a gun barrel. Officer Skipper then retrieved a handgun from Glover's pocket and placed him under arrest.

In April 2009, a federal grand jury indicted Glover for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Glover filed a pre-trial motion to suppress the evidence seized at the gas station. The district court then held a hearing on the issue during which it both heard testimony from Officers Skipper and Archer as well as viewed the patrol car's video recording of the incident. At the end of the hearing, the district court denied Glover's suppression motion. Glover subsequently entered a conditional plea of guilty and the district court sentenced him to sixty months in prison. Glover now appeals the denial of his motion to suppress.

## II.

## A.

Glover contends that the stop-and-frisk in the gas station parking lot violated the Fourth Amendment because Officers

Skipper and Archer lacked reasonable suspicion of criminal activity. According to Glover, the fact that he was merely standing near a gas station attendant in a high crime area is not enough to create a reasonable suspicion that he was planning to commit a crime. This argument neglects the import of the leading case in this area of law. In *Terry v. Ohio*, 392 U.S. 1, 24 (1968), the Supreme Court per Chief Justice Warren held that the Fourth Amendment's bar against unreasonable searches and seizures does not prohibit police officers from engaging in a brief stop-and-frisk necessary "to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." That is exactly the situation we have here.

*Terry* provides a good illustration of the type of preventive police action that complies with Fourth Amendment safeguards. While patrolling downtown Cleveland around 2:30 p.m., Officer McFadden noticed two men pacing back and forth in front of a store and conferring with one another as well as with a third man who soon left the area. Based in part on his years of experience with the neighborhood, Officer McFadden became suspicious that the men were casing the store in preparation for a robbery. Concerned that they might be carrying a gun, he followed the men, asked them what their names were, and then briefly patted one of them down, whereupon he discovered a revolver in the suspect's coat pocket. *Id.* at 5-7.

The Supreme Court upheld this conduct as constitutional. Refusing to apply the Fourth Amendment in a manner that might "exact a high toll in human injury," *id.* at 15, or "require that police officers take unnecessary risks," *id.* at 23, it held that a protective stop-and-frisk is legitimate if a police officer has a reasonable suspicion that a suspect "is armed and presently dangerous to the officer or to others." *Id.* at 24. It also held that Officer McFadden's conduct met this standard. Noting that while each of the suspects' acts was "perhaps innocent in itself," the Court concluded that "[i]t would have

been poor police work indeed" for Officer McFadden to have simply gone on his way and not to have investigated this "possibly criminal behavior" further. *Id.* at 22-23.

Since *Terry*, the Supreme Court has reaffirmed that engaging in a stop-and-frisk to prevent a crime from occurring is a valid use of police authority. *See, e.g.*, *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) ("Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger . . . ."); *Adams v. Williams*, 407 U.S. 143, 145 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur . . . ."); *see also United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004) ("[T]he very point of *Terry* was to permit officers to take preventive action and conduct investigative stops *before* crimes are committed, based on what they view as suspicious—albeit even legal—activity.") (emphasis in original). While this in practice means that officers can detain suspects for conduct that is "ambiguous and susceptible of an innocent explanation," *Terry* and its progeny permit reasonable stops in order "to resolve the ambiguity." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

This makes sense. *Terry* balanced the government's interest in protecting the public and the police from unnecessary risks and a suspect's interest in avoiding a brief frisk of his person. *See* 392 U.S. at 20-25. When an officer has a reasonable suspicion that an armed robbery is about to occur, this balance favors the government. Sparing a victim the trauma of being held up with a gun—not to mention the possibility of being injured or killed—as well as sparing an officer and suspect the risk of an armed confrontation justifies the utilization of a brief protective measure. The Constitution does not command an officer to stand idly by and run the risk that a suspect will commit a violent crime on his watch. *See id.* at 24 (holding that it would be "clearly unreasonable to deny" a police offi-

cer the ability to "neutralize the threat of physical harm" if he has reasonable suspicion that a suspect is armed and dangerous).

Because of its focus on police action designed to prevent an armed robbery, we believe *Terry* to be relevant here. It is more relevant than decisions upon which Glover relies, because those decisions do not concern the imminent outbreak of armed violence. Given that a reasonable suspicion inquiry is "multi-faceted, 'one determination will seldom be a useful 'precedent' for another,'" *Ornelas v. United States*, 517 U.S. 690, 698 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983)), and this is particularly true when the decisional contexts differ so markedly. *United States v. Sprinkle*, 106 F.3d 613, 615-18 (4th Cir. 1997), for instance, involved the stop of a suspect believed to be in the middle of a drug deal on a sunny afternoon in a crowded residential neighborhood. *United States v. Foster*, 634 F.3d 243, 246-48 (4th Cir. 2011), similarly concerned the stop of a driver believed to be involved in drug activity in the middle of the day in a low-crime area. These cases do not address how police should respond to the threat of armed robbery in a deserted gas station parking lot in the middle of the night. We must therefore look to *Terry* to guide our analysis.

## B.

With *Terry* in mind, we now ask whether the facts of this case created a reasonable suspicion that Glover was planning to commit an armed robbery. As the Supreme Court has made clear, "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). In making this inquiry, we consider the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). Factors which alone may be "susceptible of innocent explanation" can "form a particularized and objec-

tive basis" for a stop when taken together. *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002).

After considering the totality of the circumstances, we believe that Officers Skipper and Archer had reasonable suspicion to justify the stop-and-frisk of Glover. To start, the setting of the stop supports their suspicion that Glover was planning to engage in an armed robbery. The high degree of crime in an area and the lateness of the hour are each relevant factors in a reasonable suspicion inquiry, *Wardlow*, 528 U.S. at 124; *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993), and here we have both. The officers were patrolling the Eastway Division of Charlotte, an area they both knew was plagued by violent crime. As Officer Skipper later testified, "[W]ithin the three months prior to the incident, we had over 300 larceny reports, over 100 vehicles stolen, over . . . 54 robberies, 17 kidnappings, 5 rapes and 4 homicides within 10 square miles."

But the knowledge of the officers was even more precise than this. The officers knew that the gas station itself was the particular target of criminal activity. Officer Archer knew that it had been robbed before and Officer Skipper himself had investigated a previous robbery of this facility. Both officers were therefore aware that this gas station was a tempting target before they set eyes on Glover. This is an important consideration. It cannot be conclusive, however, because the nature of an area or facility does not furnish particularized suspicion as to any individual suspect. The district court put it best: while "the high crime nature of the area" does not transform it into "a search zone," it is nevertheless a relevant factor in a *Terry* analysis.

It is further relevant that Glover was watching the attendant at a time when few people would be around. Whereas in *Terry* Officer McFadden observed the suspects walking in front of a store around 2:30 in the afternoon in downtown Cleveland, the police here saw Glover watching a gas station attendant at

4:40 in the morning in a deserted parking lot. The lateness of the hour significantly lowered the risk that a robber would be observed or reported. The fact these events took place at this late hour only "compound[s] the suspiciousness" of Glover's behavior. *See United States v. Smith*, 396 F.3d 579, 586-87 (4th Cir. 2005).

We also note the vulnerability of the gas station attendant himself. As the district court observed, "24 hour gas stations like this are frequently targets of robbery," and it is not hard to see why. The attendant was alone at the station and there were only a few residences and a National Guard Armory nearby. He was also unprotected. He had left the protective confines of the locked building and, as Officer Skipper observed, was "bent down checking the fuel levels." The parking lot was completely deserted save for Glover and himself. And given that Glover was standing outside the range of the surveillance cameras, the attendant would have been unaware of his presence until after he had left the building. Common sense would suggest that this lone attendant was a candidate for a holdup.

With this setting in mind, we now turn to Glover's conduct. The officers observed him standing in the back corner of the station—a location that Officer Skipper knew fell outside the range of the station's surveillance cameras — and appearing to be talking on his cell phone. Glover was obviously not there to buy gas, as there were no cars in the parking lot. And he did not appear to be interested in purchasing anything else from the station, as he was not speaking with the attendant. In fact, the attendant told Officer Archer following the stop that "he did not know who this person was or why he was there." Instead, Glover was watching the attendant, who was busy checking the fuel tank levels.

What is more, Officer Archer noticed that Glover was "glancing around the corner" and then "would pull his head back as if he were trying to hide." Such "nervous, evasive

behavior" supports the reasonableness of the officers' belief that Glover was preparing to commit a crime. *See Wardlow*, 528 U.S. at 124. While it is important not to overplay a suspect's nervous behavior in situations where citizens would normally be expected to be upset, *see United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011), Glover was furtively watching the attendant from a location outside the range of surveillance cameras, glancing around the corner, and pulling his head back well before Officers Skipper and Archer stopped the patrol car. Such conduct is far more like the casing of the store in *Terry* than the case of nerves a citizen might ordinarily exhibit in interactions with police.

Finally, we cannot ignore Glover's actions as soon as the police left his sight. As the patrol car drove through the parking lot, Glover remained in the back corner of the station and followed the officers' movements until they left. But as soon as the police were gone, he suddenly left his location and planted himself next to the attendant. Although the officers were out of sight for only about five to six seconds, Glover had covered a distance of forty-five to sixty feet.

At this point, the attendant was in the most vulnerable position possible. He was outside of the protection of the locked building and bent over checking the fuel tank levels in a deserted parking lot. For all he and Glover knew, the police had completed their patrol of the station and would not be back for some time. Despite the fact that Glover was "standing, basically, over top of him," the two men were neither making eye contact nor speaking to one another. As the district court concluded, Glover's conduct suggests that he may have been taking advantage of the most auspicious circumstances to commit a robbery.

Given the setting and the conduct, we believe Glover's actions were sufficient to create a reasonable suspicion that "criminal activity [was] afoot." *Wardlow*, 528 U.S. at 123. In *Terry*, the Supreme Court upheld a stop based on less threat-

ening behavior. While the suspects in *Terry* were merely walking back and forth in front of a store during the middle of the afternoon, Glover moved suddenly toward a solitary gas attendant in the wee hours of the morning once it appeared that the police had left the scene. And whereas Officer McFadden stopped the suspects in *Terry* after they had walked away from their potential target, 392 U.S. at 6-7, the officers here intervened following Glover's move toward the attendant. On the basis of the record before us, we cannot see how the stop-and-frisk here was anything other than good police work that may well have prevented a man from being robbed at gunpoint with all the unpredictable consequences that such a volatile confrontation poses. As the *Terry* Court noted: "It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." *Id.* at 23. Glover's argument ignores the import of the Supreme Court's statement.

### III.

The stop-and-frisk of Glover was neither "the product of a volatile or inventive imagination" nor "undertaken simply as an act of harassment," but was instead "the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." *Id.* at 28. The Fourth Amendment does not preclude officers from taking modest steps to protect twenty-four hour gas stations, convenience stores, or fast-food outlets from armed robberies. The clerks and attendants who keep these facilities open to the public late at night often do so at considerable risk to their own safety. They often work solitary shifts in isolated circumstances where their presumed proximity to cash makes them uniquely vulnerable. Whether they moonlight as a matter of personal preference or because times are tough and other jobs are not available, we do not know. But whatever the case may

be, we decline to rule in a manner that would leave them without the reasonable rudiments of police protection.

The judgment of the district court is accordingly affirmed.

*AFFIRMED*