PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

IRVIN BUMPERS,

*Defendant-Appellant.*

No. 11-4689

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Jerome B. Friedman, Senior District Judge.
(4:10-cr-00030-JBF-FBS-1)

Argued: September 20, 2012

Decided: January 16, 2013

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the majority opinion, in which Judge Floyd joined. Judge Diaz wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Patrick L. Bryant, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON**

**BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Alexandria, Virginia, Rodolfo Cejas, II, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Norfolk, Virginia, for Appellant. Neil H. Mac-Bride, United States Attorney, Alexandria, Virginia, Kristine E. Wolfe, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Irvin Bumpers was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He now appeals the district court's denial of his motion to suppress the firearm that was the basis of his conviction. For the reasons that follow, we affirm the judgment.

I.

On the evening of December 18, 2009, Newport News Police Officer R.B. Tinsley was on routine patrol in his police car. Around 7:30 p.m., his route took him to the intersection of 27th Street and Chestnut Avenue, the location of a small shopping plaza occupied mainly by a local convenience store.

In Officer Tinsley's experience, the shopping plaza was a "high-drug" and "high-crime area" where "multiple shootings" and "countless drug arrests" had taken place. Officer Tinsley considered it to be one of the worst crime spots in the City of Newport News—an assessment that specifically included the convenience store's parking lot. The convenience store had a particular history of problems with trespassing, leading the store's owner to post "no trespassing" signs around the store and to file a written request for the police to "enforce criminal

violations" on the premises. Officer Tinsley was aware of this written request on the evening in question.

As he approached the shopping plaza, Officer Tinsley noticed two men standing next to a pair of garbage dumpsters "toward the back" of the convenience store's side parking lot, off to the north side of the building. The place where the men were standing was "not even close" to the convenience store's front entranceway, which was located on the west side of the building. There was no indication that the men had shopping bags or any other items suggestive of recent purchases from the store.

Officer Tinsley observed the two men standing by the garbage dumpsters for five to ten seconds as he approached the parking lot. Once he pulled his car into the lot, the men saw him "almost immediately" and began to walk away at a "fast pace," trying to "get away from the area." Although their path took them past the convenience store's entrance, neither man made an attempt to enter the store. Instead, their reaction matched a pattern of previous trespassing conduct in the same parking lot of which Officer Tinsley was well aware: individuals would stand "around that corner behind the dumpster" and then "immediately start to walk away" upon seeing a police officer.

Suspecting that the two men had been trespassing, Officer Tinsley exited his vehicle and told them that they were not free to go and that he needed to see their identification. One of the men disregarded Officer Tinsley's order, but the other man stopped: the defendant, Irvin Bumpers.

Bumpers informed Officer Tinsley that his name was "Aaron Bumpers." The officer ran a records check on that name, which returned an active warrant. Officer Tinsley accordingly placed Bumpers under arrest. Bumpers then informed Officer Tinsley that he had not provided his real name and that he was actually "Irvin Bumpers." The officer

ran a records check on this second name, which also returned an active warrant. Officer Tinsley told Bumpers that he was therefore still under arrest and proceeded to search him incident to that arrest. The search uncovered a fully-loaded, .38 caliber Special Taurus revolver in the pocket of Bumpers's hooded sweatshirt.

A federal grand jury indicted Bumpers for being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Bumpers filed a pre-trial motion to suppress, arguing that the revolver and ammunition were gathered as the result of an unlawful seizure. The district court held a suppression hearing during which it heard testimony from Officer Tinsley regarding the circumstances surrounding his investigatory stop of Bumpers. The court then denied the motion, ruling that the stop was supported by a reasonable suspicion that Bumpers was trespassing based on the "high crime area" where he was found, the fact that he was standing "near a dumpster on the side of the convenience store" in a location away from the entrance, his evasive reaction in "walk[ing] away from the officer at a quick pace," and the route that he took upon leaving the premises.

Bumpers proceeded to a bench trial where he stipulated to the elements of the felon-in-possession charge. The court found Bumpers guilty and sentenced him to forty-two months in prison. Bumpers now appeals the denial of his motion to suppress.

## II.

The touchstone of the Fourth Amendment inquiry is one of simple reasonableness. *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (per curiam). The term itself suggests a balance. In this case, that balance lies "between the public interest" in basic community safety and "the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878

(1975). Where to strike the balance between these two important interests is the product of intensive factual inquiry, but there can be no doubt that the weighing of these respective values informs the resolution of many a Fourth Amendment case.

On one side of the scale is the Fourth Amendment's role in preserving individual dignity and liberty by shielding citizens from arbitrary and purposeless police restraints. Thus, for example, the Supreme Court decisively rejected the argument raised in *Terry v. Ohio* that "the Fourth Amendment does not come into play at all" when a police officer detains someone in a brief investigatory stop instead of a full-blown arrest. 392 U.S. 1, 19 (1968). The Court instead announced the now-familiar standard that even a brief investigatory stop is impermissible unless the officer's action is supported by a reasonable and articulable suspicion, under all the circumstances, that criminal activity "may be afoot." *Id.* at 21, 30; *see also, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Central to the analysis in *Terry* was the Supreme Court's recognition that even a brief police investigatory stop constitutes a "restraint" of an individual's "freedom to walk away," and that such a stop can involve a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." 392 U.S. at 16, 17. That concern is surely present with respect to persons who live in the vicinity of a neighborhood convenience store like the one where Bumpers was found. Simply put, a person has every right to go about his daily business unobstructed—to do what he wants when he wants, so long as his actions violate no law. If such a person is approached by an officer who lacks reasonable suspicion that the person "has committed or is about to commit a crime," the Fourth Amendment enables the person to refuse to "answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality opinion).

Animated by this interest in individual dignity and liberty, the Fourth Amendment operates as a bar against unfounded police stops. As the Court wrote in *Terry*, the Fourth Amendment is not satisfied by a mere "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. 392 U.S. at 27. The Supreme Court has accordingly held that when considered alone, an individual's mere "presence in an area of expected criminal activity . . . is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). The individual's interest in being free from unjustified police intrusions thus does not disappear because he may be found in an area that is susceptible to crime; the interest follows the individual wherever he or she may go.

But just as the individual liberty interest is critical to the Fourth Amendment's reasonableness requirement, so too is there a weighty interest on the other side of the balance: the community's interest in basic public safety. *See Terry*, 392 U.S. at 15 (observing that the Fourth Amendment should not be applied in a "rigid and unthinking" way that would "exact a high toll in human injury and frustration of efforts to prevent crime"). That is to say, the proprietor and customers of the convenience store in this case share an important stake in the safety of the area.

The proprietor has a vital interest in ensuring that his store is a safe place for himself, his employees, and his customers because, quite simply, his business, and the well-being of those who work and shop there, depend on it. It is an all too regrettable fact that many small businesses are unwilling to locate within—or are driven out of—neighborhoods that are beset by crime. *See* Christopher H. Wheeler, *Neighborhood Characteristics Matter When Businesses Look for a Location* 15-16 (2006). Indeed, the record in this case shows that the business immediately next to the convenience store where Bumpers was found was shuttered right around the time of Bumpers's arrest.

It is also unremarkable to observe that a neighborhood convenience store can serve as a natural gathering place for drug dealers. The proprietor here thus took sensible steps to ensure the safety of his business in response to the high incidence of crime in the area and the pattern of prior trespassing on his own property: he posted "no trespassing" signs around the premises and filed a request asking the police to enforce violations. The circumstances that drive local merchants in dangerous areas to take such measures are necessarily severe, since a retailer would ordinarily not want to post "no trespassing" signs for fear of chasing off business. A retailer would only post such signs, in other words, when the dangers of trespassers lurking around the store pose a significantly greater threat than the risk of chasing customers away.

The store's patrons likewise have an interest in the safety of the area. Convenience stores often serve as a hub for local neighborhoods, a place where many residents—some who may be elderly and others who may be minors—need to shop in order to pick up some aspirin or a decongestant, purchase a quart of milk, or buy a can of soup or box of cereal. Some customers who patronize stores in disadvantaged neighborhoods may lack access to an automobile. The local convenience store thus takes on heightened importance because of its accessibility—a fact that in turn heightens the need to ensure the security of the area. Here it is undisputed that multiple shootings had taken place at this very site. In such circumstances, the local resident's journey to market must not be one of fear or apprehension that residents of more affluent communities never have to face.

The dissent protests that by referencing the convenience store's undisputed features—its trespassing signs, shuttered neighbors, multiple shootings and "violent history"—we appear to give "dispositive weight" to the high-crime nature of the area in which the stop occurred, *post* at 20. Not so. The undisputed fact that this particular convenience store was the site of multiple shootings and drug crimes is but one consider-

ation (and not the most important one) in our analysis, in addition to Bumpers's suspicious location, evasive reaction, and path of escape. Further, there is no support for the proposition that we are to ignore the circumstances surrounding the stop—circumstances that are not generalizations about high-crime areas, but are rather concrete and specific to the very store in question—and somehow apply the Fourth Amendment in a vacuum. Officers, of course, do not investigate in vacuums, they investigate in settings. To blind our eyes to such settings would simply make adjudication ill-informed.

Moreover, to hobble the ability of law enforcement officers to investigate even objectively suspicious activity raises the risk of throwing Fourth Amendment reasonableness out of balance. Recognizing the substantial public interest in community safety, the Supreme Court has made clear that in the context of brief investigatory police stops, the "balance between the public interest and the individual's right to personal security tilts in favor of" a reasonable suspicion requirement, which is of course "a standard less than probable cause." *Arvizu*, 534 U.S. at 273 (internal quotation marks and citation omitted).

It is important ultimately that neither of these two competing interests crowd the other out. With that in mind, we turn to Bumpers's contentions in this case.

III.

A.

The most precise instrument that the judiciary possesses for ensuring the proper balance between the interests that undergird the Fourth Amendment is the on-the-ground assessment of district courts. It is the trial judge who renders a particularized ruling as to the reasonableness of a *Terry* stop based on the credibility of live testimony given by those involved and, frequently, first-hand knowledge of the area where the stop

occurred. The dissent asserts, however, that we have given deference to the district court's "ultimate legal conclusion," *post* at 26. To the contrary, we have respected only the fact that one who has heard testimony has an advantage in appraising and describing the sequence of events that form the basis of a claim. *See Ornelas v. United States*, 517 U.S. 690, 700 (1996).

The distinctive competence of district court judges here is no mere abstraction. It flows from the Supreme Court's concrete admonition to appellate courts to "give due weight to inferences drawn from [findings of] fact[ ] by resident judges." *Id.* at 699; *see also Arvizu*, 534 U.S. at 273-74, 277. In noting the obvious point that the question before us is a mixed question of law and fact subject ultimately to de novo review, *Ornelas*, 517 U.S. at 691, 696, the dissent appears to give little if any weight to the function that a district court performs. It simply wishes away *Ornelas*'s express recognition of that role as "dicta," *post* at 26. But dispensing with Supreme Court analysis in this fashion is risky business. Thus, although the ultimate question of whether reasonable suspicion existed is of course a "mixed question of law and fact," that standard does not displace the reality that district judges find underlying facts and draw inferences that warrant deference. *Ornelas*, 517 U.S. at 697, 699. In the words of the Supreme Court:

> A trial judge views the facts of a particular case in light of the distinctive features and events of the community . . . . The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference. For example, what may not amount to reasonable suspicion at a motel located alongside a transcontinental highway at the height of the summer tourist season may rise to that level in December in Milwaukee. . . . The background facts, though rarely the subject of

> explicit findings, inform the judge's assessment of the historical facts.

*Id.* at 699. The familiar fact-finding advantages enjoyed by district courts dovetail with a second reason for respecting their judgments in this context. By upholding a district court's *Terry* ruling when it is objectively reasonable in light of the record, appellate courts can best achieve in the aggregate the very equipoise between individual liberty and public safety that the Fourth Amendment commands. Slight factual variations may suggest different results, and respecting the particularized character of the fact-finding process leaves room for different rulings when the credibility of the officer and/or the setting of the stop are significantly or even slightly not the same. A reversal in the face of a trial court's assessment of live testimony necessarily carries a heavier hand. There is less room for the flexibility of fact-finding in future cases and hence a heightened risk that either personal liberty or public safety will be unreasonably shortchanged.

It makes sense then in close cases such as this one to accord some respect to the fact-finder's advantaged posture and to proceed narrowly and non-preclusively in rulings of our own. District judges should continue to scrutinize the situations that come before them, mindful of our view that variable facts may lead to variable results—none of which are necessarily unreasonable so long as the Fourth Amendment balance is assiduously and conscientiously maintained.

### B.

The police conduct challenged in this case is Officer Tinsley's decision to stop Bumpers for the purpose of investigating whether he was trespassing. It is a stop at issue—not a frisk and not an arrest—either of which would have required more than Officer Tinsley had here. "Consideration of the extent of the intrusion abounds in modern Fourth Amendment doctrine." *United States v. Chaidez*, 919 F.2d 1193, 1997 (7th

Cir. 1990). Indeed, it was only upon discovering an active warrant during the *Terry* stop, and searching Bumpers incident to his undisputedly lawful arrest on that warrant, that Bumpers's firearm was discovered.

Nor does Bumpers contend that Officer Tinsley stopped him based on a suspicion that he was a felon in possession of a firearm, the crime for which he was ultimately convicted. The facts are clear that the suspicion that gave rise to the challenged investigatory stop was instead Officer Tinsley's belief that Bumpers was engaged in the particular crime of trespassing. Nothing in the Fourth Amendment renders modest measures in the enforcement of modest infractions impermissible. *See Atwater v. City of Lago Vista*, 532 U.S. 318 (2001).

With that in mind, several factors prevent us from concluding that the district court erred reversibly in its judgment that Officer Tinsley possessed a reasonable suspicion that Bumpers was trespassing at the time of the *Terry* stop. In reaching this decision, we are cognizant of the Supreme Court's observation that factors that may be "susceptible of innocent explanation" when taken in isolation can combine to "form a particularized and objective basis" for a stop when considered together. *Arvizu*, 534 U.S. at 277-78; *see also United States v. Glover*, 662 F.3d 694, 698 (4th Cir. 2011). And because the district court denied Bumpers's motion to suppress, "we construe the evidence in the light most favorable to the Government" on appeal. *United States v. Hernandez-Mendez*, 626 F.3d 203, 206 (4th Cir. 2010).

First, although the high-crime nature of the area in which a stop is performed is plainly not alone enough to support a reasonable suspicion of criminal activity, it is one of "the relevant contextual considerations" that a court may credit in a *Terry* analysis. *Wardlow*, 528 U.S. at 124. In this case, Officer Tinsley testified during the suppression hearing that the convenience store where he observed Bumpers and his companion was part of a shopping plaza where "multiple shootings"

and "countless drug arrests" had taken place. Indeed, the very place where Bumpers was standing was an area where trespassers were commonly found. Officer Tinsley was keenly aware of the area's criminal history on the evening in question, in no small part because the store owner had filed a formal request with the police to "enforce criminal violations" on the premises.

Second, the particular location and manner in which Bumpers and the other man were standing suggested that they may have been engaged in the specific, ongoing crime of trespassing. Officer Tinsley testified that as he pulled his patrol car into the convenience store parking lot, he observed Bumpers and the second man standing next to a pair of garbage dumpsters—off to the north side of the store in a location "not even close" to the store's west side entrance—for five to ten seconds. The area where the men were standing was posted "no trespassing," and Officer Tinsley could legitimately note that a dumpster in a completely different place from the store's entrance was not a natural spot for customers to be just standing around. Moreover, no evidence was presented during the suppression hearing suggesting that Bumpers or the other man were carrying shopping bags or any other items that would have indicated that they had been lawful patrons of the store.

Third, Bumpers's "evasive behavior" upon seeing Officer Tinsley's patrol car was another "pertinent factor" that contributed to the reasonable suspicion determination. *Wardlow*, 528 U.S. at 124. In *Wardlow*, the Supreme Court held that a defendant's flight upon seeing a police car in a high-crime area was enough to create a reasonable suspicion of criminal activity sufficient to justify a *Terry* stop. 528 U.S. at 124-25. Here, as in *Wardlow*, Bumpers acted to evade the police upon noticing a patrol car in a high-crime area. As Officer Tinsley testified, "[a]s soon as they noticed" the patrol car, Bumpers and the other man reacted by walking away "at a fast pace." And although Bumpers's reaction may not have been the type

of headlong flight that occurred in *Wardlow*, case law is clear that "[e]vasive conduct, although stopping short of headlong flight," is still an important factor for a court to consider when making a reasonable suspicion determination. *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993); *see also, e.g.*, *Wardlow*, 528 U.S. at 124; *United States v. Sharpe*, 470 U.S. 675, 682 n.3 (1985).

Bumpers's attempt to dodge the police created suspicion in a way that was not present in *United States v. Foster*, 634 F.3d 243, 247 (4th Cir. 2011), and *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011). In those cases, the defendants in no way sought to evade the police officers, but rather acknowledged and spoke with them, something that cannot be said of Bumpers. Moreover, Bumpers's evasive conduct added to Officer Tinsley's suspicion of criminal activity in another important respect beyond that which was present in *Foster*, *Massenburg*, and *Wardlow*. Here, Bumpers's attempt to evade the police by leaving the premises at a "quick pace" amounted to the termination of the very crime of trespassing that the officer sought to investigate—a factor that was not present in the other cases. Officer Tinsley even testified that Bumpers's reaction was consistent with a pattern of evasive activity that trespassers routinely engaged in at that exact location: "[E]verybody does the same thing in this area . . . they are back there on the—around that corner behind the dumpster [and] they immediately start to walk away" upon seeing the police.

In addition, Bumpers's attempt to quickly vacate the premises and evade the police was suspicious in another regard: it was conduct more consistent with that of a trespasser than that of a lawful customer of the convenience store. The distinction is relevant because customers of the store are not trespassers, but rather invitees who have permission to be on the premises. *See* Va. Code Ann. § 18.2-119. Unlike a trespasser, most customers would have had little reason to do what Bumpers did:

vacate the area "at a fast pace" immediately upon seeing the police.

Finally, Officer Tinsley testified that when Bumpers left the premises, he took a path that led him past the convenience store's front door—and yet he made no effort to enter. This route did nothing to dispel the officer's suspicion that Bumpers was neither a prior nor future lawful customer of the store. That is, the fact that Bumpers walked at a "quick pace" right by the entrance without entering suggested that he had not been standing by the dumpsters with some intention to shop at the store in the *future*. The route also made it unlikely that Bumpers had been a customer at the store immediately *prior* to seeing Officer Tinsley, because if that were so, it would have made little sense for him to exit the store heading in one direction (north, towards the side parking lot) only to then double back and retrace his steps in the opposite direction when it came time to leave. In other words, as the district court noted, Bumpers walked away from the spot where he was standing at a "quick pace," in exactly the reverse direction that he would have taken had he actually earlier left the store as a legitimate customer.

In sum, the totality of these factors—each of which the trial judge considered carefully in his ruling—supports the district court's conclusion that the officer had a reasonable suspicion that Bumpers was trespassing. To reverse the district court in light of these facts would impose a significant barrier to efforts to investigate trespassing violations in local shopping markets where security is critical. If the precise place had a less violent history, if the officer's testimony had been less credible, if the evasive action had been less apparent, if the pattern of trespassing had been less consistent, a different result might obtain. As it is, a reversal of sound fact-finding risks signaling an unwarranted sanctuary for behavior to which the proprietors, employees, and patrons of neighborhood convenience stores should not be subject.

## C.

Bumpers argues that reversing the district court in this case would not disable police efforts to protect public safety because officers could instead initiate voluntary police-citizen encounters to determine whether a suspected trespasser had lawful business at a store. That suggestion overlooks reality. Consensual encounters may do little to prevent trespassers from leaving the premises upon noticing the police, only to return once the police have left.

Not to worry, Bumpers suggests, because the voluntary police encounter tactic can be supplemented by an approach in which reasonable suspicion of criminal activity may be found where store owners or customers place specific calls to the police indicating that a crime has occurred. But that too fails to recognize the reality of life in crime-ridden neighborhoods. To require a business owner or customer to personally investigate and then accuse every suspicious person who lurks outside a store would place the person doing the investigating and making the call at needless personal risk.

Bumpers's argument also fails for the simple reason that it has been considered and rejected by the Supreme Court. His argument is at bottom that Officer Tinsley's decision to stop him for investigatory purposes was unreasonable because other less intrusive investigatory techniques could have been used instead. Yet in *United States v. Sokolow*, the Supreme Court explained that "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to indulge in unrealistic second-guessing." 490 U.S. 1, 11 (1989) (internal quotation marks omitted). Officers must still, of course, be held

accountable and required to explain to courts their actions, and the trial judge made sure that happened here.*

IV.

On the facts before us and for the reasons given, we affirm the judgment of the district court.

*AFFIRMED*

DIAZ, Circuit Judge, dissenting:

While on routine patrol, Newport News Police Officer R.B. Tinsley observed Irvin Bumpers for five to ten seconds standing next to another man by the side of an open convenience store near a dumpster. The store was located in a high-crime area. The store owner had posted "no trespassing" signs and had also asked the police to enforce a no trespassing policy. When Officer Tinsley approached, Bumpers quickly walked away before being stopped.

These facts are as undisputed as they are insufficient to establish a reasonable, particularized suspicion that criminal

---

*The dissent worries that upholding the stop in this case might "encourage some officers to make race-based stops under the pretense of policing high-crime areas." *Post* at 20. It is surely true that race-based stops occur and that they should be universally condemned. But race was not a factor in this case, and our friend in dissent appears to agree, *post* at 20 n.*. Thus, the district court analyzed the stop here by looking to objective factors such as Bumpers's location, his attempt to evade the police, the path he took in doing so, and the violent history of this specific site. Moreover, to view this matter through a racial lens would miss a large and important point. This case is about balancing the right of every individual in every neighborhood to avoid arbitrary police infringement on his liberty with the ability of law enforcement to ensure that every citizen of this country can exercise such basic liberties as visiting a local convenience store free from the threat of shooting and drug-related violence. Both of these are freedoms that Americans of every race and every background ought to be able to enjoy.

activity was afoot. *See Terry v. Ohio*, 392 U.S. 1, 27, 30 (1968). Permitting a *Terry* stop under these tenuous circumstances fails to prevent a substantial portion of innocent travelers in high-crime areas from being subjected to what the majority concedes can be a degrading and unwarranted intrusion. Maj. Op. at 5. Because I cannot square such a result with the dictates of the Fourth Amendment, I respectfully dissent.

## I.

## A.

The district court summarized the underlying facts, which are undisputed, as follows:

> On December 18, 2009, at approximately 7:30 p.m., Officer Tinsley was on patrol in the area of a convenience store located at 2610 Chestnut Avenue in Newport News, Virginia. While on patrol, Officer Tinsley observed the defendant standing with another man on the side of the convenience store nearby a trash dumpster.[1] As Officer Tinsley entered the parking lot, the defendant and his companion noticed Officer Tinsley's squad car and began to quickly walk away from the area. Officer Tinsley then exited his vehicle, told the defendant he was not free to leave due to possible trespassing, and asked to see the defendant's identification.[2] The defendant

---

[1] Officer Tinsley testified that he observed the defendant standing in this location for five to ten seconds, and did not see the defendant or the other man enter or leave the convenience store, which was open for business at the time these events took place. Officer Tinsley also testified that the convenience store is located in a high crime area. Specifically, Officer Tinsley noted that the convenience store is located in one of the worst "drug neighborhoods" in Newport News. Officer Tinsley also noted that shootings frequently occur in this area.

[2] At the time these events took place, the convenience store parking lot was posted "No Trespassing," and a letter requesting the police to enforce a no trespassing policy was on file with the Newport News Police Department.

stated that he did not have any identification and told Officer Tinsley that his name was Aaron Bumpers. Officer Tinsley then ran a check on the name "Aaron Bumpers," which revealed an outstanding warrant. When Officer Tinsley informed the defendant of the warrant, the defendant notified Officer Tinsley of his true name. Officer Tinsley ran a check on the defendant's true name, discovered an active warrant, and arrested the defendant. During a search incident to arrest, Officer Tinsley found a loaded .38 caliber revolver in the defendant's pocket. Officer Tinsley advised the defendant of his Miranda rights[,] and the defendant confirmed that he understood those rights. The defendant then told Officer Tinsley that he and his friend were "rolling dice" and "smoking weed" next to the dumpster.

J.A. 68-69.

Bumpers moved to suppress evidence of the firearm. The district court held that Officer Tinsley had reasonable suspicion to stop Bumpers based on (1) Bumpers's presence in a high-crime area; (2) the store's "no trespassing" sign; and (3) Bumpers's reaction to Officer Tinsley's approach.

B.

In considering the district court's ruling on a motion to suppress, we review the court's factual findings for clear error. *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011). In addition, we "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) (internal quotation marks and citation omitted). However, "the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed de novo." *Ornelas v. United States*, 517 U.S. 690, 691 (1996) (emphasis omitted).

Whenever a police officer restrains an individual's freedom to walk away, he has "seized" that person for Fourth Amendment purposes. *Terry*, 392 U.S. at 16. Brief, investigatory stops are justified "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* at 30. But an "inchoate and unparticularized suspicion or 'hunch'" is not a permissible basis for a *Terry* stop. *Id.* at 27. Moreover, "[t]hough the facts need not give rise to probable cause, the officer must be able to articulate an objectively reasonable suspicion of criminal activity" sufficient to justify the stop. *United States v. Hernandez-Mendez*, 626 F.3d 203, 207 (4th Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

We examine "the totality of the circumstances in order to determine whether officers had a 'particularized and objective basis for suspecting the person stopped of criminal activity.'" *Id.* at 207–08 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "The reasonable suspicion inquiry is fact-intensive, but individual facts and observations cannot be evaluated in isolation from each other." *Id.* at 208. An officer's articulated facts must in their totality serve to exclude a substantial portion of innocent travelers before reasonable suspicion will exist; otherwise, innocent individuals will be subject to "virtually random seizures." *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *see also United States v. Digiovanni*, 650 F.3d 498, 511 (4th Cir. 2011).

## C.

Here, the circumstances found by the district court are insufficient to support Officer Tinsley's decision to stop Bumpers. The government and the majority rely heavily on the district court's finding that Bumpers was in a high-crime area. Both, however, give this factor more weight than it can bear. "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reason-

able, particularized suspicion that the person is committing a crime . . . ." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). And while a court may consider this factor as one of many in the totality-of-the-circumstances inquiry, *id.*, the majority appears to give it dispositive weight, noting that the result might be different "[i]f the precise place had a less violent history." Maj. Op. at 14.

The Supreme Court has found reasonable suspicion where an individual's presence in a high-crime area is coupled with headlong flight, noting that such flight is the "consummate act of evasion." *See Wardlow*, 528 U.S. at 124. But affirming the district court here, where Bumpers simply walked away from the officer, sets an even lower bar for permitting stops in high-crime areas. We should be especially cautious in sanctioning this result because it poses constitutional concerns beyond the Fourth Amendment.

I have great respect for police officers, the vast majority of whom perform incredibly tough jobs with great honor and professionalism. But placing the judicial imprimatur on the stop conducted here, when a stop under similar circumstances would likely be impermissible elsewhere, may encourage some officers to make race-based stops under the pretense of policing high-crime areas.\*Cf. *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) ("If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred."). Simply put, while the location of the stop is a relevant consideration, it does not excuse police officers from articulating a reasonable suspicion specific to the particular individual stopped. *See Hernandez-Mendez*, 626 F.3d at 207-08.

---

\*I do not suggest that Officer Tinsley acted with such a motive in this case, but merely observe that potential collateral consequences caution against concluding that reasonable suspicion may be based on neighborhood characteristics and little else.

The government relies on two Virginia state cases that it claims lend substantial weight to a defendant's location when stopped on suspicion of trespassing. In particular, the government directs our attention to *Joyce v. Commonwealth*, 696 S.E.2d 237 (Va. Ct. App. 2010), where the court held that an officer had probable cause to perform a search incident to arrest when the officer observed a defendant standing at the side of a convenience store, the store had posted a "no trespassing" sign, and the officer witnessed a hand-to-hand exchange between the defendant and another man. *Joyce*, however, is readily distinguishable because the officer in that case (1) first spoke with the defendant to obtain additional information before seizing him; and (2) observed a hand-to-hand exchange between the defendant and another man, indicating both that the defendant was not lawfully on the property and that he might be engaged in a drug transaction. *Id.* at 242.

The government also relies on *Raab v. Commonwealth*, 652 S.E.2d 144 (Va. Ct. App. 2007), where the court held that an officer had reasonable suspicion to perform a *Terry* stop after observing that the defendant was parked in a restaurant parking lot at 12:40 a.m. that had "for patrons only" signs posted and attempted to drive off upon seeing the police. *Id.* at 146. In that case, however, the restaurant was closed, thus leading to the reasonable inference that the defendant was not likely a patron. In contrast, Bumpers was standing in the parking lot of a convenience store during normal operating hours.

A more apt Virginia state case is *Harris v. Commonwealth*, 551 S.E.2d 606, 607 (Va. 2001), where a police officer received an anonymous tip that an armed African-American man was selling drugs in an area posted "no trespassing." The Supreme Court of Virginia held that a *Terry* stop of the defendant was unconstitutional because "the mere presence of an unknown individual on the property of a large housing development does not create a reasonable suspicion that such an individual is engaged in trespassing or some other criminal

activity." *Id.* at 417. Likewise, Officer Tinsley merely observed Bumpers for a few seconds standing adjacent to an open convenience store, and he did nothing to determine whether Bumpers was lawfully on property open to the public before stopping him.

Both the government and the majority also rely on the district court's finding as to the direction and manner in which Bumpers walked away from Officer Tinsley. In particular, both contend that Bumpers's reaction was not that of a store patron, thereby supporting a reasonable suspicion of trespassing. *See* J.A. 17; Maj. Op. at 13.

Admittedly, when a person displays "evasive behavior," his conduct is relevant to the reasonable suspicion analysis. *Wardlow*, 528 U.S. at 124. But it is also true that "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Id.* at 125. That is precisely what happened here, as Officer Tinsley simply did not have a sufficient basis for reasonably suspecting Bumpers of *any* offense in the five to ten seconds that he saw Bumpers standing in the parking lot.

Another Virginia state case is instructive on this point. In *Ewell v. Commonwealth*, 491 S.E.2d 721 (Va. 1997), the Supreme Court of Virginia held that a police officer did not have a reasonable suspicion to stop a defendant for trespassing under the following circumstances: at 12:30 a.m. the officer observed an unfamiliar automobile in the parking lot of an apartment complex that was known for drug trafficking, and the automobile (driven by Ewell) exited the parking lot when the police officer arrived. According to the court, "nothing about Ewell's conduct was suspicious. Indeed, Ewell acted as any other person might have acted under similar circumstances." *Id.* at 723. But for the fact that Bumpers was on foot, I see no material difference between the record before us and

the circumstances found woefully lacking in *Ewell* on the question of reasonable suspicion.

In fact, the circumstances here are at least as unpersuasive as those we have previously held insufficient to create a reasonable suspicion. For example, in *Foster*, we held that a *Terry* stop was not justified where the officer observed the defendant—whom the officer knew had a prior criminal record—suddenly jump from a crouched position and move his arms in a "frenzied" manner towards the floor of the vehicle upon seeing the officer. 634 F.3d at 246-47. Likewise, in *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), we held that there was no reasonable suspicion where the officer spotted the defendant in a high-crime area huddled next to a convicted drug dealer with their hands together, the defendant attempted to hide his face from the officer as he walked past the vehicle, and the defendant acted evasively by driving off as soon as the officers passed. Finally, in *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011), we concluded that reasonable suspicion was absent where an individual was observed several blocks from where gunfire had been heard and nervously declined a consensual request for a pat down. While the result in each of these cases is admittedly fact-specific, together they illustrate that reasonable suspicion requires more than this record contains.

The majority attempts to distinguish *Foster* and *Massenburg* on the ground that the defendants in those cases acknowledged and spoke to the police officers. This, however, is an immaterial distinction because a person is not obligated to speak to law enforcement. *See* Maj. Op. at 5 (acknowledging that an individual has a right "to refuse to 'answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.'" (quoting *Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality opinion))).

Nor is this case different because, as the majority contends, Bumpers's departure terminated the suspected trespassing

offense. Except to the extent that Bumpers's attempt to leave the store parking lot might be characterized as minimally evasive, I fail to see how that fact is at all relevant; either Officer Tinsley had reasonable suspicion to stop Bumpers for trespassing, or he did not. If anything, *Foster* and *Massenburg* present more compelling cases for a valid *Terry* stop because the suspected crimes were more serious and posed potential threats to public safety, factors absent when someone is suspected of trespassing in the parking lot of an open convenience store. *Cf. United States v. Price*, 599 F.2d 494, 500 (2d Cir. 1979) ("The need for a stop depends upon factors such as the seriousness of the offense suspected [and] the consequences of delay on the part of the officers . . . ."). In this context, the crime being investigated matters. Thus, if Tinsley had witnessed a hand-to-hand exchange indicative of a drug transaction, or if he had observed a suspicious bulge indicative of a concealed weapon, the stop would likely have been justified regardless of the length of observation.

Officer Tinsley, however, saw Bumpers standing in the parking lot of an *open* convenience store for a matter of seconds before walking away quickly as the officer approached. Although there is no bright-line rule for how long an officer must observe an individual's conduct before initiating a stop, if called to account, the officer must be able to articulate facts sufficient to separate a large number of innocent travelers from intrusion. *Reid*, 448 U.S. at 441; *Digiovanni*, 650 F.3d at 511. With all due respect to my colleagues, that dividing line is nowhere to be found in the majority's holding.

There are any number of reasons why someone might be standing in a parking lot adjacent to an open convenience store. As Bumpers notes, "[i]t would hardly be remarkable for a patron to linger [a few seconds] after making a purchase, or to contemplate whether to go in the store at all, or for a pedestrian to chat with a friend whom he saw on the street, or to ask someone for directions, or simply to catch his breath while walking home." Appellant's Br. at 16. Reviewing the

district court's legal conclusions de novo, I would hold that Officer Tinsley had nothing more than a mere "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Terry*, 392 U.S. at 27. Because the Fourth Amendment and our cases require more, I would reverse the district court's judgment.

## II.

Two pervasive errors lead my colleagues to hold otherwise: (1) they fail to apply the applicable de novo standard of review; and (2) they improperly weigh a policy consideration that has no place in our analysis of whether the stop was proper.

## A.

De novo review applies to the ultimate question of whether reasonable suspicion supported Bumpers's seizure. *Ornelas*, 517 U.S. at 691. But the majority here is content to "uphold[ ] a district court's *Terry* ruling when it is objectively reasonable in light of the record," suggesting that variations in such rulings are not "necessarily unreasonable so long as the Fourth Amendment balance is assiduously and conscientiously maintained." Maj. Op. at 10.

The majority's analysis, however, bears a striking resemblance to the standard rejected in *Ornelas*. There, the Supreme Court declined to adopt a "policy of sweeping deference" to district court rulings that "would permit, [i]n the absence of any significant difference in the facts, the Fourth Amendment's incidence [to] tu[rn] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause." 517 U.S. at 697 (internal quotations omitted, alterations in original). According to the Court, such a result "would be inconsistent with the idea of a unitary system of law" and "unacceptable." *Id.*

Yet the majority clings to dicta from *Ornelas* concerning appellate review of *factual* findings and inferences drawn from those findings to justify its decision to defer to the district court's ultimate legal conclusion, despite the absence of any factual disputes in this record. This, in my view, improperly gives district courts carte blanche to determine whether a Fourth Amendment violation has occurred and abdicates our duty to independently review such legal determinations. *Id.*

The majority also suggests that by failing to defer generally to district court rulings on *Terry* stops, this court would allow "less room for the flexibility of fact-finding in future cases and hence a heightened risk that either personal liberty or public safety will be unreasonably shortchanged." Maj. Op. at 10. I see little merit to this concern because the facts of *Terry* stop cases are generally sui generis, and we properly accord substantial deference to a district court's factual findings. As a result, the cases do not lend themselves easily to broad holdings, and so are not likely to inflexibly hamper the district courts. Far more troubling is the threat to individual liberties when we fail to exercise our own judgment in deciding whether law enforcement has unlawfully subjected a person to an unconstitutional intrusion.

### B.

In addition to failing to apply the correct standard of review, the majority stretches the totality-of-the-circumstances test beyond its proper limit. When assessing a Fourth Amendment violation, courts generally review "the circumstances known to the officer and 'the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005) (quoting *Terry*, 392 U.S. at 27). But to lend further support to the stop in this case, the majority also opines on the role of public safety in fostering the economic viability of convenience stores in urban areas, without

citation to any authority except a policy paper from the Federal Reserve Bank of St. Louis. *See* Maj. Op. at 6-7.

To my knowledge, no court has heretofore applied a version of Fourth Amendment "lite" based on the socioeconomic needs of the community where a stop occurs. To the contrary, all persons should expect that courts will honor their right to be free from unreasonable seizures "whether he or she is one of the most affluent or most vulnerable members of our community." *Foster*, 634 F.3d at 249. Any lesser standard "has the necessary effect of legitimizing the [unlawful] conduct which produced the evidence," *Terry*, 392 U.S. at 13, a result we should not condone.

## III.

In my view, the district court erred in concluding that Officer Tinsley had a reasonable suspicion to stop Bumpers for trespassing. Accordingly, I respectfully dissent.